**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MV REALTY PBC, LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>INNOVATUS CAPITAL PARTNERS, LLC,<br><br>                    Defendant. | Civil Action No. _____<br><br>**COMPLAINT** |

Plaintiff MV Realty PBC, LLC ("MV Realty"), by and through its undersigned attorneys, hereby files its Complaint for Declaratory Relief against Defendant Innovatus Capital Partners, LLC ("Innovatus"), and states in support of this Complaint as follows:

## INTRODUCTION

1.   Plaintiff MV Realty brings this action seeking a declaration that Defendant Innovatus may not prohibit MV Realty from entering into agreements with homeowners by which the homeowner receives an upfront payment in exchange for a first right of refusal to list the home when the homeowner decides to sell the home in the future.  Innovatus has no proprietary rights of any kind with respect to such activities, which have been in the public domain for many years.

## PARTIES

2.   Plaintiff MV Realty PBC, LLC ("MV Realty") is a Florida limited liability company established in 2004.  MV Realty's members are citizens of Florida.

3.   Defendant Innovatus Capital Partners, LLC ("Innovatus") is a Delaware limited liability company.  On information and belief, Innovatus's members are all citizens of New York, Connecticut, or Sweden.

1

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Florida. On information and belief, Defendant is a citizen of New York, Connecticut, and Sweden. The amount in controversy exceeds $75,000.

5. Venue is appropriate in the Southern District of New York under 28 U.S.C. §1391(b)(1) and 28 U.S.C. §1391(c)(2). Innovatus resides within the Southern District of New York.

## FACTUAL ALLEGATIONS

A. **Background Regarding the Parties**

6. Innovatus is a New York investment firm which, on information and belief, maintains over $1.6 billion assets under management.

7. MV Realty, which was established in 2004, is a South Florida real estate brokerage organized under the laws of the State of Florida as a manager-managed limited liability corporation. As of April 2018, MV Realty had approximately 40 full-time employees.

8. During the operative period of this Complaint, and as reflected in documents filed publicly with the Secretary of State for the State of Florida, the only authorized managers of MV Realty were Steven Mackey and Amanda Zachman (f/k/a Amanda Zuckerman).

9. During the operative period of this Complaint, the members of MV Realty were Amanda Zachman (f/k/a Amanda Zuckerman) and a Florida partnership, each of which had 50% ownership of MV Realty. The Florida partnership had three partners: Steven Mackey, Jonathan Moulton, and Asymmetrical, LLC, each of which held a one-third interest in the partnership's 50% ownership of MV Realty. Asymmetrical, LLC is a limited liability corporation organized under the laws of the State of Delaware and is owned and operated by Jonathan Neuman.

10. No member of MV Realty controls a majority of the company's shares, nor did any member of MV Realty control a majority of the company's shares during the operative period of this Complaint.

### B. Innovatus Approaches Neuman and Mitchell About a Confidential "Business Opportunity"

11. On or about August 23, 2017, Jonathan Neuman, an individual, participated in a call with David Schiff of Innovatus that had been scheduled to discuss business matters unrelated to this Complaint. Those business issues had nothing to do with real estate or MV Realty.

12. During the conference call, David Schiff of Innovatus told Neuman that Innovatus wished to discuss another potential collaboration with Neuman and Tony Mitchell (a longtime business associate of Neuman) involving an unidentified business opportunity. Schiff had collaborated on business matters with Neuman and Mitchell in the past, none of which involved real estate or MV Realty.

13. At the time, Schiff was aware that Neuman and Mitchell had extensive experience originating and securitizing asset classes that had not previously been securitized.

14. During the conference call, Innovatus did not make any disclosure regarding the nature of the unidentified business opportunity, because Innovatus represented that the potential business opportunity was confidential and not available in the public domain. Innovatus indicated that in order to maintain the confidentiality of the potential business opportunity, Innovatus would disclose the business opportunity only pursuant to a Non-Disclosure Agreement.

### C. The Non-Disclosure Agreement and Term Sheet Prepared by Innovatus

15. On or about August 24, 2017, Innovatus sent Neuman and Mitchell a Non-Disclosure Agreement ("NDA") and Term Sheet for execution by Neuman and Mitchell in their

3

individual capacities, as well as by Neuman on behalf of Ritz Advisors, LLC ("Ritz"), an entity owned and operated by Neuman.

16. Ritz is not now, and has never been, an owner or member of MV Realty. Ritz is an entity used by Neuman in connection with other business activities, including with respect to financing transactions related to securitization of assets unrelated to real estate.

17. Without any knowledge of the "confidential" business opportunity Innovatus intended to disclose, Neuman, Mitchell, and Ritz simultaneously executed the NDA and Term Sheet on August 24, 2017. A true and correct copy of the NDA and concurrently-executed Term Sheet is attached hereto as Exhibit 1.

18. Consistent with Innovatus's representation to Neuman that the potential business opportunity was confidential, the NDA (which was titled simply as a "NON-DISCLOSURE AGREEMENT") stated: "[T]he parties wish to explore a possible business opportunity related to the purchase, and subsequent securitization, of real estate related forward contracts (the 'Business Opportunity'), *which will involve the disclosure of Confidential Information* (as defined below) by the Disclosing Party [Innovatus] or its representatives to the Receiving Parties [Neuman, Mitchell, and Ritz]." Ex. 1, at 1 (emphasis added).

19. Section 1 of the NDA defined Confidential Information as "all nonpublic information disclosed by" Innovatus to Neuman, Mitchell and Ritz. *Id.* at 1. Section 2 of the NDA expressly excluded from Confidential Information any information that "is or has become generally available in the public." *Id.*

20. The Term Sheet, which was sent to Neuman, Mitchell and Ritz along with the NDA, stated that, if the parties decided to proceed with a transaction, the Term Sheet was "intended to form the basis of the agreement between the parties . . . related to the Business

Opportunity (as further defined in that certain Non-Disclosure Agreement entered into among the Parties on the date hereof (the 'NDA'))." *Id.* at 1.

21. In turn, the NDA defined the "Business Opportunity" as involving "the purchase, and subsequent securitization, of real estate related forward contracts (the 'Business Opportunity'), which will involve the disclosure of Confidential Information." *Id.* at 1. Thus, using mandatory language, the NDA defined the "Business Opportunity" as requiring the combination of two distinct subparts: (1) the "purchase… of real estate related forward contracts," and (2) the "subsequent securitization" of those contracts.

22. The Term Sheet identified the parties' roles with respect to the two subparts of the "Business Opportunity." With respect to the first subpart, the Term Sheet stated that Ritz or another designee of Neuman and Mitchell "shall be the exclusive real estate brokerage firm utilized in connection with the Business Opportunity." *Id.* at 1. With respect to the second subpart, the Term Sheet stated that an affiliate or designee of Innovatus "shall be the exclusive distributor of the securities issued in connection with the securitization of the contracts contemplated by the Business Opportunity." *Id.*

**D. Innovatus Discloses the Confidential "Business Opportunity" to Neuman and Mitchell**

23. On August 24, 2017, following execution of the NDA and Term Sheet, Innovatus disclosed to Neuman and Mitchell the "Business Opportunity," which it again indicated was confidential and not available in the public domain.

24. The "Business Opportunity" proposed by Innovatus involved combining two parts: the purchase of a large number of real estate listing agreements (i.e., agreements in which homeowners agree to use a specified real estate broker on an exclusive basis), followed by the securitization of those listing agreements.

25. Innovatus indicated its belief that this "Business Opportunity" had significant value because (1) the market for the securitization of assets was booming, and (2) no investment firm had ever securitized this type of asset before. Innovatus wanted to be the first investment firm to do so.

26. Innovatus further believed that by bundling large numbers of listing agreements, the value of the securitized package would be very attractive because it would closely track home value appreciation. That was because a listing agreement gives the broker a right to receive a commission in the future – a commission based on the future sale price of the home – such that, as the value of the underlying home increased, so too would the value of the listing agreement. According to Innovatus, the fact that the value of the securitized listing agreements would increase with home price appreciation would make securitization of these assets uniquely attractive in the securitization marketplace.

27. Notably, at the time that Innovatus approached Neuman and Mitchell, Innovatus was aware that Neuman and Mitchell had extensive experience originating and securitizing asset classes that had not previously been securitized. The "Business Opportunity" identified by Innovatus involved the securitization of real estate listing agreements, an asset which had not previously been securitized.

28. Consistent with the Term Sheet, Innovatus proposed (1) that an entity designated by Neuman and Mitchell would be responsible for the "purchase" portion of the "Business Opportunity," and (2) that an entity designated by Innovatus would be responsible for the "securitization" portion of the "Business Opportunity."

29. David Schiff of Innovatus told Neuman and Mitchell that he had first come up with the concept of the "Business Opportunity" in 2007, but that he had tried and failed to find a viable means of acquiring real estate listing agreements.

**E. Innovatus Is Introduced to MV Realty, Which Innovatus Authorizes to Enter Into "Right to List Agreements"**

30. Shortly after the NDA and Term Sheet were executed in August 2017, Neuman and Mitchell, acting in their individual capacities, began collaborating with Innovatus to explore the "Business Opportunity" identified by Innovatus.

31. By early October 2017, Innovatus, Neuman and Mitchell decided that it would be helpful for real estate agents to begin entering into transactions with homeowners that would result in broker listing agreements.

32. With the assistance of counsel, the parties developed a form called the Right To List Agreement ("Right to List Agreement") that was to be used together with an industry standard form Real Estate Listing Agreement ("Listing Agreement").  A true and correct copy of the Right to List Agreement and accompanying Listing Agreement is attached hereto as Exhibit 2.

33. The Right To List Agreement was to be used together with the Listing Agreement because Innovatus believed that doing so would strengthen the broker's right to the listing in a way that would further Innovatus's goal of securitizing the asset.

34. At or about that time, Neuman introduced Innovatus to MV Realty, a South Florida real estate brokerage established in 2004.

35. Innovatus was aware, as reflected in documents generated by Innovatus, that Neuman was a non-controlling shareholder in MV Realty.  As indicated above, Neuman was not an authorized manager of MV Realty.

36. Innovatus requested that MV Realty approach MV Realty's clients and enter into listing agreements with homeowners using the Right to List Agreement.

37. Innovatus did not require MV Realty to sign a non-disclosure agreement with Innovatus. Nor did it ask MV Realty to require that prospective customers sign a confidentiality agreement.

38. On or around November 3, 2017, with Innovatus's full knowledge and consent, MV Realty entered into its first Right to List Agreement with a homeowner.

39. As a necessary part of the transaction, and with Innovatus's full knowledge and consent, the Right to List Agreement was disclosed to (and executed by) the third-party homeowner.

F. **MV Realty Is Asked to Sign – But Does Not Sign – a Non-Disclosure Agreement**

40. On November 7, 2017, after MV Realty had already begun entering into Right to List Agreements with homeowners, Innovatus proposed an agreement with MV Realty, titled "Joinder to the Non-Disclosure Agreement." The proposed agreement, which was prepared by Innovatus, identified the NDA executed by Neuman, Mitchell and Ritz on August 24, 2017, and stated: "MV hereby agrees that upon execution of this Joinder, it shall become a party to the NDA and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the NDA as though an original party thereto as of [August 24, 2017] and shall be deemed to be a Receiving Party for all purposes thereof." A true and correct copy of the joinder agreement Innovatus proposed on November 7, 2017 is attached hereto as Exhibit 3.

41. The joinder agreement proposed by Innovatus was designed to retroactively bind MV Realty to the terms of the NDA executed by Neuman, Mitchell and Ritz on August 24, 2017. Under the joinder agreement proposed by Innovatus, MV Realty would have been subject to

continued performance (*i.e.*, non-disclosure) for a period exceeding the one-year term identified in New York's statute of frauds, N.Y. General Obligation Law § 5-701.

42. MV Realty never executed the joinder agreement proposed by Innovatus.

43. Despite not having executed the joinder agreement, and with the full knowledge and consent of Innovatus, MV Realty thereafter entered into dozens of additional Right to List Agreements with homeowners.

44. In each case, with Innovatus's full knowledge and consent, the Right to List Agreement was disclosed to (and executed by) the third-party homeowner (all of which were MV Realty's customers and not previously known to Innovatus).

45. In addition, with Innovatus's full knowledge and consent, MV Realty shared the Right to List Agreement with many other prospective customers who elected not to enter into an agreement. Innovatus did not require that any of those prospective customers enter into a confidentiality agreement.

46. Innovatus did not share in the expenses incurred by MV Realty in soliciting and entering into the Right to List Agreements with customers. These expenses include, among others, the payment to the homeowner to induce it to enter into the agreement, the expenses incurred in identifying and marketing the transaction to the homeowner, and the compensation paid to MV Realty's agents in securing executed agreements.

47. Innovatus never purchased any of the dozens of Right to List Agreements from MV Realty.

### G. Innovatus, Neuman and Mitchell Learn of Third Party Patents

48.     In or about November 2017, Innovatus, Neuman and Mitchell learned of several patents that had been issued to third parties long before Neuman and Mitchell executed the NDA with Innovatus.

49.     In particular, the parties learned of U.S. Patent No. 7,440,926 B2 (the "Harrington Patent"), which had been issued on October 21, 2008.  A true and correct copy of the Harrington Patent is attached hereto as Exhibit 4.

50.     Among other things, the Harrington Patent disclosed "one possible embodiment of the present invention, which allows a homeowner (i.e., consumer) to receive an upfront payment in return for the homeowner (i.e., consumer) agreeing to use the services of a real estate broker (i.e., holder) or brokerage firm, or giving that broker a first right of refusal to list the property."  Ex. 4, column 6.

51.     The Harrington Patent further disclosed that a homeowner could be offered "the opportunity to enter into an 'option listing contract' or 'opt-contract' concerning any future offering of the homeowner's house for sale, i.e., a contract for the future right for the broker to list the house."  *Id.*

52.     The disclosures in the Harrington Patent have been in the public domain since at least 2008 and do not constitute "Confidential Information" under the NDA executed by Neuman, Mitchell and Ritz on August 24, 2017.  First, Section 1 of the NDA defines Confidential Information as "nonpublic information disclosed by" Innovatus to Neuman, Mitchell and Ritz.  Second, Section 2 of the NDA expressly excludes from Confidential Information any information that "is or has become generally available in the public."

### H. Execution of NDAs by Zachman and Williams in Their Individual Capacities

53. On or about November 13, 2017, Innovatus indicated to Neuman that agents working for MV Realty should be asked to execute NDAs "related to the initiative [i.e., the 'Business Opportunity'] preventing them from discussing it with prospective (or new) employers."

54. On November 14, 2017, Innovatus sent Neuman proposed "agent NDAs" for execution by two of MV Realty's agents, Amanda Zachman and Greg Williams, in their individual capacities.

55. On November 14, 2017, Amanda Zachman, in her individual capacity, executed the NDA prepared by Innovatus. A true and correct copy of the Zachman NDA is attached hereto as Exhibit 5. On November 14, 2017, Greg Williams, in his individual capacity, executed the NDA prepared by Innovatus. A true and correct copy of the Williams NDA is attached hereto as Exhibit 6.[1]

### I. Innovatus Terminates Negotiation of the Joint Venture

56. The Term Sheet, which was executed by Innovatus, Neuman, Mitchell, and Ritz on August 24, 2017, provided that it would "form the basis of the agreement between the parties hereto (the 'Parties') in connection with any subsequently consummated transaction related to the Business Opportunity." It further provided that, "if a transaction is to be subsequently completed among the Parties regarding the Business Opportunity, the terms herein shall form the basis for such transaction and accordingly, shall be legally binding on the Parties."

---

[1] On January 22, 2018, Daryl Clark, who had recently agreed to serve in a CFO capacity supporting the Joint Venture, executed an NDA prepared by Innovatus. A true and correct copy of the Clark NDA is attached hereto as Exhibit 7.

57. The Term Sheet provided for 50/50 ownership of the Joint Venture, with Innovatus owning 50%, and Neuman and Mitchell owning 50%.

58. Following execution of the Term Sheet, Innovatus represented that control of the Joint Venture would be shared 50/50 as well. Specifically, Innovatus represented that decisions of the Board of Directors would require a majority vote, and that the Board of Directors would have four directors, two of which would be designated by Innovatus, and two of which would be Neuman and Mitchell or their designees.

59. The Term Sheet provided for an "Exclusivity Period" of 60 days (subject to a one-time 60 day extension), during which Neuman, Mitchell and Ritz were prohibited from engaging in any "Competing Transaction." A "Competing Transaction" was defined as "a transaction with any person or entity similar to the transactions contemplated herein, whether or not such transaction is structured in a manner that is comparable or similar to those contemplated herein." Thus, after the Exclusivity Period, Neuman, Mitchell and Ritz would no longer be prohibited from engaging in a "Competing Transaction." Neuman and Mitchell therefore expected and understood that negotiation of the Joint Venture agreements would be pursued promptly.

60. As negotiation of the definitive agreements for the Joint Venture dragged on for months, Neuman and Mitchell repeatedly expressed concern to Innovatus. During this period, Innovatus repeatedly offered excuses for the delays while assuring Neuman and Mitchell that the Joint Venture would be consummated.

61. In April 2018, nearly eight months after it first approached Neuman and Mitchell, Innovatus suddenly insisted on a material change to the fundamental structure of the Joint Venture. Innovatus insisted that, in the event that Neuman or Mitchell were no longer able to serve as a director (a circumstance which could be triggered by certain actions that could be

12

undertaken by Innovatus), their replacement would be required to be independent of Neuman and Mitchell. At the same time, Innovatus indicated that it would not accept a similar requirement for replacement of its own directors.

62. At the time that it demanded this material change to the proposed structure of the Joint Venture, Innovatus told Neuman and Mitchell that, as an investment firm, its investors would not permit Innovatus to proceed with the structure originally proposed by Innovatus. To the extent Innovatus was being truthful about the prohibition imposed by its investors, that would have been known to Innovatus at the time it proposed that structure to Neuman and Mitchell.

**J.   Innovatus's April 30, 2018 Conference Call with Neuman and Mitchell**

63. On April 30, 2018, during a conference call, Innovatus told Neuman and Mitchell that if they did not accept the modified structure demanded by Innovatus for the Joint Venture, Innovatus would pursue the "Business Opportunity" independently, and that the NDA would prohibit Neuman and Mitchell from pursuing the "Business Opportunity" without Innovatus.

64. During the April 30, 2018 conference call, Neuman and Mitchell informed Innovatus that they would not agree to Innovatus's demands. Mitchell also pointed out that, over a six month period, and with Innovatus's full knowledge and consent, MV Realty had entered into dozens of listing agreements with homeowners using the Right to List Agreement. Mitchell stated that Innovatus could not prohibit MV Realty from entering into listing agreements with homeowners in the future. David Schiff of Innovatus became upset and threatened to sue MV Realty to prohibit MV Realty from doing so.

65. During the April 30, 2018 conference call, Neuman asked Schiff several times to identify the business activities he contended MV Realty could not pursue. Schiff responded by saying that, if Neuman insisted Schiff do that, Innovatus would "get the lawyers involved."

Schiff repeatedly refused to discuss the activities he believed MV Realty was prohibited from pursuing.

66. The next day, May 1, 2018, in hopes that cooler heads might prevail, Neuman sent an email to Schiff in which he provided contact information for outside counsel and asked to arrange a call with outside counsel for Innovatus. Neuman and Mitchell believed Schiff was being unreasonable, but they remained hopeful that the Joint Venture might still proceed or, alternatively, that the parties would go their separate ways without a dispute.

67. Ten days later, on May 11, 2018, counsel for Innovatus contacted counsel identified in Neuman's May 1, 2018 email. The email asked simply whether counsel would accept service of a Complaint that Innovatus had just filed in this Court.

### K. Innovatus Brings Breach of Contract Claims Against Neuman, Mitchell, Ritz, Clark, Williams, and Zachman – But Not Against MV Realty

68. On May 11, 2018, Innovatus filed a Complaint against Neuman, Mitchell, Ritz, Zachman, Clark, and Williams for breach of their respective NDAs, and also sued Neuman and Mitchell for anticipatory breach of their NDA on the basis of the April 30, 2018 conference call. A true and correct copy of Innovatus's Complaint (the "Innovatus Complaint"), filed in in Civil Action No. 18-civ-4252 in the Southern District of New York, is attached hereto as Exhibit 8.

69. MV Realty is not named as a Defendant in the Innovatus Complaint, which asserts only contract-based claims. As discussed above, MV Realty is not a party to any contract with Innovatus. To the contrary, on November 7, 2017, Innovatus asked MV Realty to sign an agreement joining Innovatus's NDA with Neuman, Mitchell and Ritz, but MV Realty did not sign the joinder agreement (or any other agreement) with Innovatus. (Innovatus also later proposed making MV Realty a party to the Joint Venture, but that agreement too was never executed.)

70. Under the joinder agreement proposed by Innovatus – which MV Realty did not sign – MV Realty would have been subject to continued performance (*i.e.*, non-disclosure) for a period exceeding the one-year term identified in New York's statute of frauds, N.Y. General Obligation Law § 5-701.[2]

### L. Innovatus Continually Refuses to Identify the Injunctive Relief it Seeks

71. On May 14, 2018, in the hope of avoiding costly and needless litigation, counsel for the defendants named in the Innovatus Complaint wrote to counsel for Innovatus to advise it that all pending (i.e., unexecuted) "Right to List" transactions had been cancelled and that no new "Right to List Agreements" would be executed. That letter also asked Innovatus to identify the "Confidential Information" that the Innovatus Complaint alleges the defendants are trying to "abscond with," so that any such information could be returned to Innovatus.

72. On June 6, 2018, counsel for defendants named in the Innovatus Complaint wrote to counsel for Innovatus asking Innovatus to identify the scope of the conduct it seeks to enjoin.

73. Consistent with Innovatus's refusals during the April 30, 2018 conference call, *supra* ¶ 65, Innovatus has refused to identify (1) any of the allegedly "Confidential Information," or (2) the scope of the conduct it seeks to enjoin. If Innovatus were to provide that information, the NDA parties could resolve this controversy by returning any allegedly "Confidential Information" to Innovatus, and by ensuring that future business activities are structured to avoid the scope of the injunction Innovatus intends to seek.

74. A true and correct copy of the correspondence between outside counsel is attached hereto as Exhibit 9.

---

[2] According to Innovatus's own Complaint, there would have been no "means of terminating the NDA prior to the Termination Date." Ex. 8, ¶ 38.

### M. <u>MV Realty Seeks a Declaration That It Is Free to Pursue Exclusive Listing Agreements with Homeowners (But Will Not Use the "Right to List Agreement")</u>

75. Although MV Realty is not named as a defendant in the lawsuit by Innovatus, the Innovatus Complaint seeks injunctive relief to prohibit "MV Realty PBC, LLC [] from directly or indirectly pursuing or taking advantage of the Business Opportunity."  Ex. 8 ¶ 44.[3]

76. MV Realty is not pursuing (and does not intend to pursue) the "Business Opportunity," either directly or indirectly.

77. MV Realty is not pursuing (and does not intend to pursue) securitization of real estate related forward contracts, either directly or indirectly.

78. In an attempt to avoid a dispute, MV Realty stopped entering into "Right to List Agreements" with homeowners.  MV Realty did that even though Innovatus disclosed the form "Right to List Agreement" to MV Realty without requiring MV Realty to execute a non-disclosure agreement, and even though Innovatus permitted MV Realty to disclose the form "Right to List Agreement" to numerous prospective customers without requiring the prospective customers to sign a confidentiality agreement.

79. Going forward, MV Realty intends to enter into agreements with homeowners by which the homeowner receives an upfront payment in exchange for giving MV Realty the first right of refusal to list the home when the homeowner decides to sell the home in the future.

80. Engaging in such transactions, which have long been in the public domain (including through the disclosures in the Harrington Patent) will generate profits for MV Realty

---

[3] The Innovatus Complaint falsely asserts that "Neuman and Mitchell operate MV Realty through Defendant Ritz and non-party MV Realty PBC, LLC, both of which they control." Ex. 8, ¶ 21.  As indicated above, neither Neuman, Mitchell nor Ritz were or are authorized managers of MV Realty; and neither Neuman, Mitchell nor Ritz control or controlled MV Realty.

exceeding hundreds of thousands of dollars, and will also allow MV Realty to avoid laying off employees it intends to use to solicit and enter into those transactions.

## COUNT ONE

### Declaratory Judgment That MV Realty May Pay Homeowners for the First Right of Refusal to List Their Homes for Sale in the Future

81.  MV Realty incorporates by reference the allegations contained in Paragraphs 1 through 80, as if set forth fully herein.

82.  Innovatus has filed a lawsuit in which it alleges that MV Realty is restricted by certain non-disclosure agreements entered into between other parties, but not by MV Realty, and stating that it will seek an injunction to prohibit certain undefined activities by MV Realty.

83.  Innovatus has repeatedly refused to identify the activities it contends MV Realty is prohibited from pursuing.

84.  MV Realty intends to pursue and enter into agreements with homeowners by which a homeowner receives an upfront payment in exchange for giving MV Realty the first right of refusal to list the home when the homeowner decides to sell the home in the future.  Such activities have long been disclosed in the public domain.

85.  An actual, present and justiciable controversy has arisen between MV Realty and Innovatus with respect to MV Realty's business activities.

86.  MV Realty seeks a declaration that Innovatus may not prohibit MV Realty from entering into agreements with homeowners by which the homeowner receives an upfront payment in exchange for giving MV Realty the first right of refusal to list the home when the homeowner decides to sell the home in the future.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays for relief and judgment as follows:

1. Awarding Plaintiff a declaration that Innovatus may not prohibit MV Realty from entering into agreements with homeowners by which the homeowner receives an upfront payment in exchange for giving MV Realty the first right of refusal to list the home when the homeowner decides to sell the home in the future; and

2. Awarding such other relief as this Court may deem just and proper.


Dated:  August 2, 2018                                              Respectfully Submitted,

                                                                                   s/ Jason C. Raofield

                                                                                   Jason C. Raofield
                                                                                   COVINGTON & BURLING LLP
                                                                                   One CityCenter
                                                                                   850 Tenth Street, NW
                                                                                   Washington, DC 20001-4956
                                                                                   Tel:  202.662.5072
                                                                                   jraofield@cov.com
                                                                                   (*pro hac vice* application submitted)

                                                                                   *Attorney for Plaintiff*